# O'Connor v. Commonwealth.

(Decided March 25, 1932.)

BRENT C. OVERSTREET for appellant.

J. W. CAMMACK, Attorney General, and GEORGE H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

Thomas P. O'Connor has been sentenced to eight years in the penitentiary for robbery. On October 4, 1924, the Axton Fisher Tobacco Company sent its traffic

manager, August C. Wolf, to the Eighteenth and Broadway branch of the Louisville National Bank to get money for its pay rolls. He got this money and had started to the company's office, and was on Colgan street, near Eighteenth street, when three men in a Buick touring car drove up beside him and forced him to drive over to the curb and to stop his machine. They then robbed him of the factory pay roll, amounting to $2,514.76, took his keys, and left.

Wolf took the license number of the machine used by the robbers. It was Missouri 83-791. Efforts to trace this Buick car by this license were fruitless, further than to disclose this license was issued to a Mr. Gould for a Marmon car, motor No. 10182, which was stolen from Mr. Gould on April 24, 1924, and later recovered by the St. Louis police department without the license. Nothing was done for nearly three years, but on May 6, 1927, the grand jury returned an indictment charging Louis Mulconroy, Thomas P. Connor (same as Thomas P. O'Connor), and Gus Winkler with this robbery. O'Connor was put on trial June 2, 1930, and convicted. His motion for a new trial having been overruled, he has appealed, and relies on the following grounds for reversal.

(a) "Because the Court erred in permitting the Commonwealth's Attorney to ask questions of the defendant regarding certain arrests of him by police officers in the city of St Louis."

To understand the ruling of the court in this regard, we must state some of the evidence. Lawrence Dougherty, an inmate of the penitentiary, was introduced as a witness by the commonwealth, and he testified that a few weeks before this robbery he, with a man named Farina and another named Gus Winkler, came from St. Louis to Louisville for the purpose of watching the habits of Mr. Wolf in getting this pay roll, to learn the time he would get it, the route over which he would return, etc.; that they then returned to the Hoffman house in St. Louis, and his exact language is:

"We had several conversations among ourselves, O'Connor and Winkler and Farina and a fellow named Mulconroy and several other fellows that hung around there."

"Winkler and I and Farina had expected to come and at the last moment something else intervened to keep us from coming."

Dougherty then related that, when the time came, Winkler, Mulconroy, and O'Connor came to Louisville and later reported they had done the job and offered him his part, which he explains in these words:

"It is customary for people of that type to put out a ten per cent end to anybody that gives them a tip of a robbery."

O'Connor testifying in his own behalf denied participating in any of these conversations, or in doing or planning this or any other robbery, or that he was acquainted with Dougherty, Winkler, Mulconroy, or Farina further than that he had seen them about the Hoffman house. He testified he did not associate with them. His defense was an alibi, and he claimed he suffered a fracture of the patella in an automobile wreck on September 26, 1924, and was treated therefor until October 30, thus making it impossible, so he argues, for him to have been in Louisville on October 4, 1924, when this robbery was done.

If the testimony of Dougherty is true, then there was at this Hoffman house a den of thieves, whose conversations were evil, whose business was crime, and O'Connor was one of that gang.

Ordinarily it is not permissible to ask a defendant about crimes or arrests therefor, other than the one for which he is on trial, but in this case, after the defendant had testified in chief that he did not associate with Dougherty, Winkler, etc., and did not know them other than by sight, as one might know President Hoover, Henry Ford, or General Pershing, though he had never met them personally, then it became permissible for the commonwealth to show O'Connor's testimony was false, by asking him and other witnesses about his associations with Dougherty, Winkler, etc., and to show by the defendant and by others that he did associate with them, and to prove the happening, when he was with them, of occurrences calculated to make an impression on his mind, for example, to show he was arrested in company with members of this gang. If, in its efforts to show O'Connor did associate with these men, the common-

wealth had shown they had gone to church together, gone hunting together, taken lunch together, or attended a ball game together, no one would suggest such was error. If the commonwealth can show O'Connor's statement, that he did not know these men, was untrue, by showing such associations as above, then why cannot it show such acquaintance by showing they were arrested together?

In like manner, when O'Connor testified he had never been in Louisville previous to his indictment for this robbery, it was permissible for the commonwealth to attack the truth of that statement, by asking him and the officer arresting him, if he and Winkler were not arrested in St. Louis in June, 1926, and if they did not then have in their car some extra hats and caps bearing the name of a Louisville haberdasher and did not then say they had been there to the Derby.

Also after O'Connor testified he got his kneecap fractured on September 4, 1924, and was then living at 3840 Laclede avenue, it was permissible to ask him how soon he recovered, to ask him if he had recovered on November 11, 1924, and, when he said he could not say, it was then permissible for the commonwealth to endeavor to show by him or any other witness that he was arrested for a breach of the peace on November 11, 1924, and had then given his address as 3218 North Taylor Street, because of the light it might throw upon the truth of his claim that after September 26, 1924, he was in bed for a long time and had to walk on a crutch and cane after he got up. Men so crippled do not usually figure in breaches of the peace.

(b) "Because the Court erred in not allowing the defendant to introduce the Official Police Bulletin of the Police Department of the City of Louisville of October 4th, 1924, which contained a description of the men alleged to have participated in the holdup of the witness Wolf."

Wolf testified that O'Connor was one of the men who robbed him, and he was the man who held the gun on him and took his money, and, on cross-examination, said that on the day of the robbery, he described him as about 30 years of age, 5 feet 7 inches tall, dark hair, and eyes, heavy eyebrows and lashes, wearing a cap and dark suit of clothing.

O'Connor had the idea that there existed an official police bulletin of the city of Louisville in which the man who took this money from Wolf was described thus:

"Six feet, 200 pounds, extra heavy moustache, curled at both ends, four day growth of beard, brown felt hat, flat brim dark glasses."

Wolf was asked if he had not described this man as stated in the alleged bulletin, and Wolf said, "No, Sir." When Chief of Detectives Larkin was on the stand, counsel for O'Connor asked him if Wolf had not described the man who took this money from him as stated in this alleged bulletin, and he answered, "He did not." The court properly refused to admit the alleged bulletin. No witness testified Wolf ever so described the man who took the money from him.

(c) "Because the Court erred in not permitting the defendant to introduce a memoranda of the doctor who attended the defendant for certain injuries which contained the dates of his first visit to the defendant, the number of calls thereafter, the amount of his bill, and the nature and extent of defendant's injuries."

This memorandum is before us. It is a receipted bill written on a prescription blank printed for and furnished to Dr. J. A. Glasscock by the Kolkmann Drug Company, of St. Louis, Mo. It is about five by six inches in size, was written with a pencil, and is faded and yellowed from age and exposure to light and air. It contains twenty-one items of services rendered, and four credits; then concludes with this statement, "Discharged as O. K. J. A. G. Balance due $25.00. Then follows: "Dec. 1, $25.00 paid by McGary." It appears to have been written all at one time. It is to all appearances simply an itemized and receipted bill.

Dr. Glasscock is dead, but O'Connor put the doctor's son on the stand and showed by him this memorandum is in the handwriting of his father. Then he offered this memorandum in evidence, but was not permitted to read it. It was properly refused. If Dr. Glasscock were alive and on the stand, he would not be permitted to read it. He could use is to refresh his memory, but he would have to testify independently of the paper to what he

personally knew about the matter after his memory was refreshed.

It is argued for O'Connor that this memorandum rises to the dignity of a book of accounts kept in the usual and regular course of business, and hence was admissible after it was shown to be in the doctor's handwriting and that he was dead.

Waiving other objections, the paper was not admissible because it fails to meet another requirement, variously stated as follows:

> "The entry must have been made at or about the time of the transaction recorded." Greenleaf on Evidence (15th Ed.), vol. 1, sec. 115.

> "Made contemporaneously with the transactions shown." Baskett et al. v. Rudy, 186 Ky. 208, 217 S. W. 112, 115.

> "Kept at the time the transactions occurred." Louisville Bridge Co. v. L. & N. R. Co., 116 Ky. 258, 75 S. W. 285, 287, 25 Ky. Law Rep. 405.

No one says when these entries were made. A Mr. McGary, probably the same man as the one who paid the last $25 on this account, was on the stand, but he says nothing about this memorandum. Its appearance would indicate it was all written at one time. It does not meet the requirements. He is seeking to get this paper in under the "shophook rule"; hence he must bring this within the rule.

The entries must appear to have been made in the regular course of business, under such circumstances as to import trustworthiness, and the book must be in such shape that it may be presumed to be the register of the daily business transactions of the party offering it. A single charge of a sale or other transaction in a book will not render it a book of accounts within the rule. A book containing charges against a single person cannot be admitted. See 22 C. J., p. 868, sec. 1042.

In Givens v. Pierson's Admx. 167 Ky. 574, 181 S. W. 324, 326, Ann. Cas. 1917C, 956, we find this:

> "Entries made on tickets or stubs or slips of paper . . . are treated as mere memoranda, admissible . . . for the purpose of refreshing the memory of the party who made them . . . but

not as independent or substantive evidence of the fact that the transaction took place.''

(d) ''Because the Court erred in permitting the Commonwealth to introduce incompetent proof in rebuttal.''

O'Connor had testified he had never been in Louisville until after he was indicted. Then it became permissible for the commonwealth to show this was possibly untrue by showing in rebuttal that in June, 1926, he told certain officers in St. Louis he was returning from the Derby.

(e) ''Because the Commonwealth's Attorney was guilty of error in his argument to the jury when he stated to them, 'that the defendant was only sorry that he had not murdered Mr. Wolf, because if he had he would not be here today to testify against him.' ''

These are not the words that were used. Here is the language as given in the bill of exceptions:

''During the course of his closing argument to the jury, the Assistant Commonwealth's Attorney stated to the jury that these fellows (referring to the defendant) were sorry they had not murdered Mr. Wolf today, because if they had he wouldn't be on trial.''

An attorney is not permitted to misstate the evidence, but he is allowed to draw reasonable inferences from the evidence given and the conduct of the defendant. The language complained of was such an inference, and the defendant's objection to it was properly overruled.

The judgment is affirmed.